Samuel M. Lasser (SBN – 252754)
slasser@edelson.com
EDELSON PC
1934 Divisadero Street
San Francisco, California 94115
Tel: 415.994.9930
Fax: 415.776.8047

Rafey S. Balabanian*
rbalabanian@edelson.com
Alexander T.H. Nguyen*
anguyen@edelson.com
Amir C. Missaghi*
amissaghi@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice admission to be sought

Attorneys for Plaintiff and the Putative Class

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| TONY DICKEY, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>ADVANCED MICRO DEVICES, INC., a Delaware corporation,<br><br>*Defendant.* | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **Violations of Cal. Civ. Code §§ 1750 *et seq.*;**<br>2. **Violations of Cal. Bus. & Prof. Code §§ 17200, *et seq.*;**<br>3. **Violations of Cal. Bus. & Prof. Code §§ 17500, *et seq.*;**<br>4. **Fraudulent Inducement;**<br>5. **Breach of Express Warranties;**<br>6. **Negligent Misrepresentation; and**<br>7. **Unjust Enrichment.**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION** |

Plaintiff Tony Dickey ("Plaintiff" or "Dickey") brings this class action complaint ("Complaint") against Defendant Advanced Micro Devices, Inc., ("AMD" or "Defendant") based on its deceptive marketing of certain of its central processing units ("CPUs"). Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1. AMD is one of two major companies that design and produce CPUs[1] for personal computers. Competing against rival Intel Corporation, AMD battles for consumer sales by emphasizing key CPU specifications in its marketing and advertisements. For many years, CPUs were compared against each other based on their "clock" speeds (in units of Megahertz ("MHz") and Gigahertz ("GHz")).

2. More recently, though, both manufacturers (AMD and Intel) have moved away from MHz and GHz towards a new metric called a "core." A core is an independent processing unit, which, like early CPUs, performs one calculation at a time. To increase performance, manufacturers began making CPUs with two or more cores on one physical chip, creating "multicore" CPUs. Each core in a multicore CPU is able to operate (*e.g.*, perform calculations and execute instructions) independently from other cores. An eight-core CPU, then, can perform eight calculations simultaneously and independently. Therefore, if one core is bogged down with a complex or defective process, the other cores can handle other calculations or processes so that the computer can continue performing at rapid speed.

3. AMD's recent marketing reflects its shifting focus to selling multicore CPUs. AMD's advertising has highlighted the number of cores in its CPUs and consistently conveyed to consumers that multiple cores in a single CPU allow consumers to perform several simultaneous tasks.

---

[1] A CPU is an integrated circuit which "generally consists of hundreds of millions or billions of transistors that process data and control other devices in the system, acting as the 'brain' of the computer." AMD, *10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934*, 4 ("AMD 10-K"), true and accurate excerpts of which are attached hereto as Exhibit A.

4.      With the launch of its "Bulldozer" line of CPUs, AMD announced and promoted the introduction of the "world's first 8 core CPU."[2] AMD stated that, with eight cores, its Bulldozer processors were the pinnacle of performance and that consumers could multitask greater than before. Central to AMD's marketing was that the Bulldozer CPU had "8-cores."

5.      In claiming that its Bulldozer CPU had "8-cores," AMD tricked consumers into buying its Bulldozer processors by overstating the number of cores contained in the Bulldozer chips. In fact, the Bulldozer chips functionally have only four cores—not eight, as advertised. Notably, AMD built the Bulldozer processors by stripping away components from two cores and combining what was left to make a single "module." But by removing certain components of two cores to make one module, they no longer work independently. As a result, AMD's Bulldozers suffer from material performance degradation and cannot perform eight instructions simultaneously and independently as claimed.

6.      Average consumers in the market for computer CPUs lack the requisite technical expertise to understand the design of Defendant's processors, and trust Defendant to convey accurate specifications regarding its CPUs. Because AMD did not convey accurate specifications, tens of thousands of consumers have been misled into buying Bulldozer CPUs that do not conform to what AMD advertised, and cannot perform the way a true eight core CPU would (*i.e.*, perform eight calculations simultaneously).

7.      Accordingly, this putative class action lawsuit seeks (i) to prevent Defendant from continuing to misrepresent the specifications of its Bulldozer-based CPUs, and (ii) actual damages for those deceived into purchasing the products under false pretenses.

**PARTIES**

8.      Plaintiff Tony Dickey is a natural person and citizen of the State of Alabama.

9.      Defendant Advanced Micro Devices, Inc., is a Delaware corporation with its principal place of business located at One AMD Place, P.O. Box 3453, Sunnyvale, CA 94088. AMD does business throughout the United States and the State of California, including in this

---

[2]      *See infra* note 8.

1 | District.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than the Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

11.     This Court has personal jurisdiction over Defendant because Defendant conducts business in California, is headquartered in California, and because the events giving rise to this lawsuit occurred, in substantial part, in California.

12.     Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Defendant maintains its headquarters and conducts significant business in this District.

## INTRADISTRICT ASSIGNMENT

13.     Pursuant to Civil Local Rule 3-2(e), this case shall be assigned to the San Jose Division.

## CHOICE OF LAW

14.     California law governs the substantive legal issues in the instant matter. AMD's "Terms of Use / Copyright" state that "[a]ny claim relating to the Materials shall be governed by the internal substantive laws of the State of California, United States of America."[3] Moreover, the instruction manual that accompanies every AMD Bulldozer processor incorporates AMD's "Terms of Use."[4]

15.     AMD's conduct at issue herein also occurred in California. AMD is headquartered in California, and the advertisements at issue here were, on information and belief, drafted in and

---

[3]     A true and accurate copy of AMD's "Terms of Use / Copyright" is attached hereto as Exhibit B.

[4]     A true and accurate copy of AMD's form "AMD Processor" document is attached hereto as Exhibit C (stating that "[f]or more information please visit www.amd.com," and that consumers should reference what is "set forth in AMD's Standard Term and Conditions of Sales ... ").

disseminated from California.[5]

**FACTUAL BACKGROUND**

**I.      An Introduction to AMD and CPU Core Technology**

16.     AMD was founded in 1969 in Sunnyvale, California and has grown into a global semiconductor manufacturer with facilities around the world. Today, it is the second-largest supplier of the CPUs found in personal computers and laptops ("PCs"), behind only Intel Corporation ("Intel").

17.     Since its inception, AMD has battled with Intel over market share of the consumer PC CPU market. Early on, personal computer CPUs were limited to performing only a single calculation (*i.e.*, processing one instruction) at a time. As such, AMD and Intel focused their advertisements on how fast their CPUs could perform a single calculation, in units of "clock" speed. A CPU's high Megahertz (MHz) and then Gigahertz (GHz) speeds were indicative of high performance.

18.     As advertised clock speeds began to plateau, CPU manufacturers began to increase (and then advertise) the number of "cores" in their CPUs. AMD and Intel increased the core-count of their CPUs by essentially joining two or more CPUs into one physical processor (called a "die"). A core, as it is understood in the industry, is a processing unit that is capable of performing calculations independent from other cores. A two-core CPU, then, can multitask—that is, perform two calculations simultaneously and independently (just as two separate CPUs) at a certain clock speed. For instance, a CPU advertised as being an "8-core 3.4 GHz CPU" is representing that it has eight independent cores, each performing calculations at 3.4 gigahertz.

19.     Through its marketing, AMD consistently disseminated the common meaning (and, with Intel) helped create the consumer expectation that a core is an independent processing unit. For example, AMD uses the common definition of a core in its investor filings:

" … semiconductor companies are designing and developing multi-core [CPUs], where

---

[5]      *Search | LinkedIn*, www.linkedin.com/vsearch/p?keywords=marketing&postalCode= 94101&openAdvancedForm=true&locationType=I&countryCode=us&distance=100&f_CC=1497 (last visited Oct. 26, 2015) (showing 92 public profiles of AMD marketing employees within 100 miles of San Francisco, California).

multiple processor cores are placed on a single die or in a single processor. Multi-core [CPUs] offer enhanced overall system performance and efficiency because computing tasks can be spread across two or more processing cores, each of which can execute a task [*i.e.*, a calculation] *at full speed*."[6]

20.     AMD used the same definition in 2007 when stated that its then new "Dual-Core processor puts the power of dual-core technology on the desktop. Dual-core processors contain *two processing cores, residing on one chip, that perform calculations on two streams of data …* "[7] and that "[w]ith dual-core technology *there are two complete processor cores in one physical package …* ."[8]

21.     And, in 2010, AMD reinforced the consumer expectation that cores are processors independent from each other, stating that its CPUs are offered "[w]ith the power of four processor cores on a single chip, [and] deliver[] industry-leading multitasking performance."[9] Even today, AMD defines a core as being "two or more processors on a single chip."[10]

22.     Similarly, Intel—AMD's main competitor, and effectively the only other brand of CPUs cross-shopped by consumers—defines a core as such as being "a hardware term that describes the number of independent central processing units in a single computing component (die or chip)."[11]

23.     However, since launching its "Bulldozer" CPUs, AMD has deceived consumers by

---

[6]     *AMD 10-K*, 4, *supra* (emphasis added).

[7]     *Amazon.com: AMD Athlon 64 X2 Dual-Core 5600+ 2.8 GHz Processor, Socket AM2: Electronics*, http://www.amazon.com/gp/product/B000MNA082?ie=UTF8&ref_=de_a_ smtd&showDetailTechData=1#technical-data (last visited Oct. 26, 2015) (emphasis added). (describing dual-core AMD CPU released in 2007).

[8]     *AMD Athlon 64 X2 5200 Brisbane Dual-Core 2.7GHz Socket AM2 65W ADO5200DOBOX Processor - Newegg.com*, www.newegg.com/Product/Product.aspx?Item=N82E16819103210 (last visited Oct. 26, 2015) (emphasis added) (describing dual-core AMD CPU released in 2007).

[9]     *AMD Phenom II X4 970 Black Edition Deneb Quad-Core 3.5GHz Socket AM3 125W Desktop Processor HDZ970FBGMBOX - Newegg.com*, www.newegg.com/Product/ Product.aspx?Item=N82E16819103894 (last visited Oct. 26, 2015) (describing four-core AMD CPU released in 2010).

[10]     *See e.g., AMD Processors for Business*, www.amd.com/en-us/innovations/software-technologies/processors-for-business (last visited Oct. 26, 2015); *Multi-Core Processing with AMD*, http://www.amd.com/en-us/innovations/software-technologies/processors-for-business/multicore (last visited Oct. 26, 2015).

[11]     *ARK | Intel® Core™ i5-6600 Processor (6M Cache, up to 3.90 GHz)*, ark.intel.com/ products/88188/Intel-Core-i5-6600-Processor-6M-Cache-up-to-3_90-GHz (last visited Oct. 26, 2015).

---

1  advertising Bulldozers as having eight cores—two more than the competition—when they really

2  only have four complete cores.

3  **II.    AMD Falsely Advertises Its Bulldozer Chips As Having Eight "Cores."**

4          24.    With its Bulldozer product line, AMD aimed to further convince consumers that a

5  high core-count in a CPU is equal to high performance, emphasizing that it offers more cores than

6  the competition. A close inspection of the Bulldozer's CPU architecture and technical literature,

7  however, reveals that AMD has uniformly overstated the number of cores in its processors.

8          *A.    AMD advertises its Bulldozer CPUs as having eight "cores."*

9          25.    Since launching the Bulldozer CPUs, AMD's marketing online and on packaging has

10  centered on their number of purported cores in each Bulldozer CPU. For example, on its website

11  www.amd.com, AMD advertises the following for its Bulldozer chips:



13

14  Take your PC's megatasking abilities to extreme

15  levels with the first native 8-core desktop
    processor built with dynamic, tuneable
    performance to handle multiple intensive apps

16  without breaking a sweat.

17

18  (**Figure 1**) (emphasis added.)[12]                    (**Figure 2**) (emphasis added.)[13]

19          26.    AMD makes similar representations at online retailers' webpages for the Bulldozer

20  processors. For example, AMD caused the NewEgg.com and Amazon.com product page

21  descriptions to prominently include the number of cores in the title for the Bulldozer processors:

22      AMD FX-9590 Vishera 8-Core
23      4.7GHz Socket AM3+ 220W
        FD9590FHHKWOF Desktop
24      Processor - Black Edition

25  (**Figure 3**, AMD's Newegg.com page) (emphasis added.)[14]

26  ――――――――――――――――――――
    [12]    *AMD FX Processors*, http://www.amd.com/en-us/products/processors/ desktop/fx (last
    visited Oct. 26, 2015).

27  [13]    *AMD FX 8-Core Black Edition FX-9590| Processors |*, http://shop.amd.com/en-
    us/components/processors/ecxMicUS861229 (last visited Oct. 26, 2015).

28



(**Figure 4**, AMD's Amazon.com page) (emphasis added.)[15]

27.     Beyond webpage titles, AMD provides the same online retailers descriptive marketing copy for its Bulldozer processors. For instance, AMD repeatedly emphasizes that the Bulldozer processors have eight cores:

(**Figure 5**, showing AMD's representations on Newegg.com) (emphasis added.)[16]

28.     AMD similarly ensured that its marketing at brick-and-mortar stores emphasized the

---

[14]     *AMD FX-9590 Vishera 8-Core 4.7GHz Socket AM3+ 220W FD9590FHHKWOF Desktop Processor - Black Edition - Newegg.com*, www.newegg.com/Product/Product.aspx?Item= N82E16819113347 (last visited Oct. 26, 2015).

[15]     *Amazon.com: AMD Athlon 64 X2 Dual-Core 5600+ 2.8 GHz Processor, Socket AM2: Electronics, infra.*

[16]     *AMD FX-9590 Vishera 8-Core 4.7GHz Socket AM3+ 220W FD9590FHHKWOF Desktop Processor - Black Edition - Newegg.com, supra.*

Bulldozers' core-count. For example, AMD prominently displays that the FX-9590 Bulldozer CPU has "8 cores" on the product's packaging, including on two different product seals that must be broken before consumers can access the processor (*i.e.*, consumers must view the representation before using the product). *See* Figures 6–8.



(**Figure 6**, showing the FX-9590 Bulldozer's retail packaging) (emphasis added.)[17]

 

(**Figure 7**, showing product seal and incorporation of www.amd.com) (emphasis added.)

 

(**Figure 8**, showing secondary product seal and incorporation of www.amd.com) (emphasis added.)[18]

29.     Taken together, AMD's marketing and advertisements for the Bulldozer

---

[17]     Figures 6 and 7 are excerpts taken from AMD's FX9590 Bulldozer processor's packaging, a true and accurate reproduction of which is attached hereto as Exhibit D.
[18]     Figure 8 is an excerpt taken from AMD's FX9590 Bulldozer processor's secondary packaging, a true and accurate reproduction of which is attached hereto as Exhibit E.

1    processors—including those appearing on every processor's packaging—make clear that the

2    Bulldozer CPUs have "8-cores." However, as explained below, AMD has overstated the number of

3    cores within its Bulldozer processors.

4              B.    *AMD's Bulldozer CPUs Do Not Have Eight Cores.*

5              30.    Despite Defendant's claims, AMD's Bulldozer CPUs do not have eight cores as

6    advertised. Instead, AMD designed its Bulldozers around four component-sharing "modules" rather

7    than eight independent cores. A technical inspection of the Bulldozer processors and a review of

8    trade publications demonstrate that Bulldozers are missing key components compared to true eight

9    core CPUs. As a result, they cannot perform in the same way and at the same speed.

10             31.    The foundation of every AMD Bulldozer processor is AMD's "module" technology

11   that contains two processing units.[19] In its marketing, AMD represents that each module contains

12   two cores, but that is not the case because a Bulldozer module begins as a single core, to which

13   AMD adds some—but not all—of the components from another core. As described above, a core is

14   a processing unit (what once was a single CPU) that is independent from other processing units on

15   the same physical chip or die. AMD's decision to provide each module with only *some* (but not all)

16   of the components of two cores means a module contains only one complete core, not two as

17   advertised. While two cores can simultaneously process two instructions independently from each

18   other, AMD's Bulldozer modules cannot.

19             32.    A visual comparison of a module to a core reveals that a module does not contain

20   two cores. Figure 9 shows a pre-Bulldozer AMD CPU design. There, a sing core has a dedicated

21   (not shared) floating-point unit ("FPU")[20] along with L1 and L2 cache. Similarly, Figure 10 shows

---

[19]      AMD subsequently released "Piledriver" and "Steamroller" processors that contain and
were built using Bulldozer module technology.

[20]      A floating point unit is a sub processor purpose-built to perform calculations related to
"floating points," or non-integer number (*i.e.*, numbers with decimal places). L2 cache is a bank of
computer memory that serves as a repository for a processing unit.

a current Intel design where a single core has a dedicated (not shared) FPU and L1 and L2 cache.[21]

With these designs, each core can process an instruction independently from other cores because it

has its own dedicated cache and FPU, among other components. These processing units, then fit

into the standard definition of a core. And, an 8-core CPU built with these designs will have eight

copies of the cores shown above on one physical processor or die, and contain eight FPUs and eight

sets of L1 and L2 cache.



(**Figure 9**, showing AMD's Phenom II core with a separate and dedicated (non-shared) floating-point unit and L2 cache, among other components.)



(**Figure 10**, showing Intel's Westmere core with a separate floating-point unit and L2 cache, among other components)

---

[21]    In addition to its multi-core processors, Intel offers a "Hyper-Threading" feature on its CPUs. Hyper-Threading is a technology used by Intel to create virtual cores. Specifically, engineers found that by adding additional components to a CPU, it may be possible to cause one core to process two instructions rather than one. By including Hyper-Threading, Intel increased performance of a single core. However, Hyper-Threading does not offer the same performance as two "physical" (*i.e.*, actual) cores.

Importantly, Intel does not market its CPUs with Hyper-Threading as having more cores than a chip without Hyper-Threading. That is, Intel does not count Hyper-Threading's virtual cores as additional "physical cores." For example, Intel advertises its Hyper-Thread enabled Core i5 chips as having "2 cores" but being capable of executing "4 threads," what it defines as "a software term for the basic ordered sequence of instructions that can be passed through or processed by a single CPU core." *See ARK | Intel® Core™ i5-5250U Processor (3M Cache, up to 2.70 GHz)*, http://ark.intel.com/products/84984/Intel-Core-i5-5250U-Processor-3M-Cache-up-to-2_70-GHz (last visited Oct. 26, 2015).

(**Figure 11**, showing a Bulldozer module with two module processing units marked as "Core 0" and "Core 1" and sharing a single floating point unit and L2 cache) (emphasis added, showing shared components.)[22]

33.    But as Figure 11 reveals, AMD designed its module processing units to share common components. As such, AMD's advertised "cores" are not independent from each other and are not really cores. For instance, AMD's Bulldozer module processing units share a single FPU. If one module processing unit performs a floating point calculation, the other must wait until that resource is free for its own floating point calculation, creating a bottleneck. The same is true for the L2 cache, and other shared sub-components. A Bulldozer CPU advertised as having "eight cores," then, has eight module processing units but only four FPUs, four sets of L2 cache, and four sets of other important core components. As such, the "eight core" AMD Bulldozer CPU does not have eight cores under the industry standard definition.

34.    Technical trade publications (*i.e.*, publications not read by average consumers) have also taken note of the differences between AMD's Bulldozer module processing units and actual cores. One industry publication stated that "the Bulldozer module doesn't incorporate two complete cores" as advertised.[23] The publication "estimated that a Bulldozer module could [at most] average 80% of [the performance of] two complete cores."[24]

---

[22]    *Intel & AMD, Architectural Discussion, How Far Ahead Is Intel ? - CPUs, Motherboards, and Memory - Linus Tech Tips*, http://linustechtips.com/main/topic/48571-intel-amd-architectural-discussion-how-far-ahead-is-intel/ (last visited Oct. 26, 2015).

[23]    *Per-Core Performance - AMD Bulldozer Review: FX-8150 Gets Tested*, www.tomshardware.com/reviews/fx-8150-zambezi-bulldozer-990fx,3043-3.html (last visited Sept. 22, 2015).

[24]    *Id.*

35.    The publication went on to state that, according to Microsoft (the developer of the Windows operating system), **modules have performance characteristics more similar to [Hyper-Threading] than physical cores, so [it] is looking to detect and treat them the same as Hyper-Threading in the future.**"[25] That is to say, Microsoft recognized that a module did not have two cores, but only two module processing units (which are not the same) and compared a module to an Intel core with "hyper-threading" technology, as described in footnote 24.

36.    In fact, when not marketing to consumers, AMD acknowledges that a module is not equal to two cores. In 2013, AMD released a technical video of one of its engineers describing the Bulldozer design.[26] In the video, the engineer states that AMD's modules have "additional sharing" when compared to existing cores and that *modules*, rather than module processing units, have "everything necessary to schedule a code on these processors."[27] That is, an "8 core" Bulldozer CPU with four modules really only has four actual cores.

   C.    *Misrepresenting a CPU's Core-count is Material.*

37.    As the AMD engineer put it: Bulldozer module processing units share more resources than a core. In practice, AMD's choice to design the Bulldozer module processor units to share components creates a performance bottleneck compared to CPUs with actual cores.

38.    When it was released in 2011, AMD advertised its 3.3 GHz FX-8150 Bulldozer processor[28] as being the "first-ever eight-core desktop processor" for consumers.[29] Intel's competing chip at the time was its four core Intel Core i7-2600K running at 3.3 GHz.[30] As these specifications suggest, the competing chips operate at the same clock speeds, but AMD seemingly bests Intel on core-count. As such, consumers in the market for CPUs would identify the AMD chip

---

[25]    *Id.* (emphasis in original).
[26]    AMD, *"Bulldozer" Processor Topology*, May 28, 2013, www.youtube.com/watch?v=4EAuVsXWQ0s (last visited Oct. 26, 2015).
[27]    *Id.*
[28]    *The Bulldozer Review: AMD FX-8150 Tested - Print View*, *supra*.
[29]    AMD, *Unlock Your Record Setting AMD FX Series Processor Today*, (10/12/2011) http://www.amd.com/en-us/press-releases/Pages/unlock-your-record-setting-2011oct12.aspx (last visited Oct. 26, 2015).
[30]    *The Sandy Bridge Review: Intel Core i7-2600K, i5-2500K and Core i3-2100 Tested*, http://www.anandtech.com/show/4083/the-sandy-bridge-review-intel-core-i7-2600k-i5-2500k-core-i3-2100-tested (last visited Oct. 26, 2015).

as the better offering because it offers double the number of cores at the same speeds—therefore it would be expected that AMD's CPU would be twice as fast as Intel's. But as described above, the Bulldozer does not contain eight cores, only four modules, and its performance is less than it would be for a true eight-core CPU.

39.   For instance, <u>Figure 13</u> is a chart from a representative technical review of a Bulldozer processor compared against a Intel's processors (lower is better). There, the "8-core" FX-8150 Bulldozer processor is 96% slower than the 4-core (with Hyper-Threading) Intel Core i7-2600K.[31] In fact, the reviewer discovered that the new "8-core" Bulldozer chip was often *slower* than AMD's older 6-core processor.[32]



(**Figure 13**, showing AMD's Bulldozer "AMD FX-8150," taking 2:03 minutes to complete a task, markedly slower than Intel's "Core i7" at 1:09 minutes and AMD's pre-Bulldozer chip, the "Phenom II" at 1:35 minutes.)[33]

40.   The reason AMD's "8-core" Bulldozer was slower than Intel's 4-core CPU and its own 6-core CPU is that it does not have "8-cores," but only eight module processing units with shared components. Average consumers in the market for a CPU lack the requisite technical expertise to understand the underlying design of the Bulldozer processors. Instead, average

---

[31]   *Id.*

[32]   *Id.*

[33]   *Per-Core Performance - AMD Bulldozer Review: FX-8150 Gets Tested*, http://www.tomshardware.com/reviews/fx-8150-zambezi-bulldozer-990fx,3043-6.html (last visited Oct. 26, 2015); *see also The Bulldozer Review: AMD FX-8150 Tested - Print View*, http://www.anandtech.com/print/4955/the-bulldozer-review-amd-fx8150-tested (last visited Oct. 26, 2015) (stating that in some instances, "Bulldozer simply does not perform," and even in other cases, "the improvement over the previous generation [AMD six-core CPU] simply isn't enough to justify an upgrade.")

1    consumers trust AMD to convey accurate specifications in its marketing.

2        41.    And although AMD knew that average consumers were unable to discern the

3    falsehood of its representations at the time of sale, AMD misled consumers who desired a processor

4    with eight cores by advertising inflated core-counts of its Bulldozer CPUs. As a result, tens of

5    thousands of consumers have been deceived by AMD's marketing and purchased Bulldozer

6    processors believing AMD's representations about its core-count to be true.

7    **III.    Plaintiff Dickey's Experience With His FX-9590 Processor.**

8        42.    On March 10, 2015, Plaintiff navigated to AMD.com. On AMD's website, Plaintiff

9    saw representations identical to those in Figures 1 and 2. Specifically, Plaintiff saw representations

10   that the FX-9590 Bulldozer chip was "the first native 8-core desktop processor" and had "8-

11   core[s]."

12       43.    Plaintiff then navigated to www.Newegg.com where he saw AMD's representations

13   claiming that the Bulldozer processor had "8 cores." The representations he saw were created by

14   AMD and provided by it to Newegg.com. Specifically, Plaintiff saw representations on

15   Newegg.com that the FX-9590 Bulldozer was the "first native 8-core desktop processor" and "the

16   industry's first and only native 8-core desktop processor for unmatched multitasking and pure core

17   performance with 'Bulldozer' architecture," identical to the representations in Figures 3 and 5.

18       44.    After viewing the representations, and on March 10, 2015, Plaintiff purchased two

19   FX-9590 Bulldozer processors on Newegg.com for $299.99. Plaintiff then read the representations

20   that AMD created for the processors' packaging when he received the FX-9590 processors in the

21   mail but prior to opening and using the product. Specifically, Plaintiff read AMD's representations

22   that the FX-9590 Bulldozer was an "8-core" processor, as shown in Figures 6–8.

23       45.    Plaintiff then began using the AMD FX-9590 Bulldozer processors. However, as

24   described above, the FX-9590 Bulldozer processors Plaintiff purchased did not have eight cores

25   each. Instead, they each only contained four Bulldozer "modules," which at best could constitute

26   four cores. As a result, Plaintiff's AMD FX-9590 Bulldozer processors did not perform as well as a

27   CPU with the same clock speed but with eight true cores.

28

**CLASS ACTION COMPLAINT**                    15

46.     Plaintiff reasonably relied upon AMD's express representations about the FX-9590's core-count in choosing to purchase that particular processor—namely, that the FX-9590 had two more cores than Intel's competing processors. Those representations were material to his purchase: without them, Plaintiff would either have not purchased the FX-9590 chips or he would have paid less for them.

47.     Accordingly, Plaintiff has suffered damages as the result of AMD's misrepresentations in the form of money paid to purchase the FX-9590 Bulldozer processors.

48.     Plaintiff is likely to consider purchasing AMD's processors in the future and requires an injunction requiring AMD to truthfully advertise its processor specifications going forward. Defendant AMD is one of only two major companies that provide processors for consumer personal computers.[34] As such, Plaintiff will be exposed to AMD's deceptive marketing in the future and is effectively left with no other option but to purchase products from AMD or Intel. Plaintiff would consider purchasing AMD's Bulldozer chips in the future if they were accurately advertised and priced commensurately with their true value. Moreover, an injunction requiring AMD to stop falsely marketing its CPUs will have an effect on the market for CPUs, leading to fewer misleading advertisements.

## CLASS ALLEGATIONS

49.     **Class Definition:** Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of himself and a Class of similarly situated individuals defined as follows:

> All individuals in the United States that purchased any of the following AMD Bulldozer processors: FX-8120, FX-8150, FX-8320, FX-8350, FX-8370, FX-9370, and FX-9590.[35]

---

[34]     Kay, Roger, *Intel v. AMD: The Juggernaut Vs. The Squid,* Forbes.com (Nov. 25, 2014), http://www.forbes.com/sites/rogerkay/2014/11/25/intel-and-amd-the-juggernaut-vs-the-squid/ (last visited Oct. 26, 2015).

[35]     True and accurate copies of the online advertising and on-box representations for the FX-8120, FX-8150, FX-8320, FX-8350, FX-8370, FX-9370, and FX-9590 Bulldozer processors ("Bulldozer Processors") are attached hereto as Exhibit F, emphasis showing substantially similar representations and specifications. As the representations in Exhibit F show, AMD built all of the Bulldozer Processors around the same "Bulldozer Microarchitecture," meaning the processors only differ with regards to price, clock speed (GHz), and other non-material or not-at-issue features. *See*

1   The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this

2   action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors,

3   predecessors, and any entity in which the Defendant or its parents have a controlling interest and its

4   current or former employees, officers and directors; (3) persons who properly execute and file a

5   timely request for exclusion from the Class; (4) persons whose claims in this matter have been

6   finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's

7   counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

8        50.    **Numerosity**: The exact number of members of the Class is unknown and is not

9   available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class

10   likely consists of tens of thousands of individuals. Class members can be easily identified through

11   Defendant's or its agents' records.

12        51.    **Commonality and Predominance**: There are many questions of law and fact

13   common to the claims of Plaintiff and the other members of the Class, and those questions

14   predominate over any questions that may affect individual members of the Class. Common

15   questions for the Class include but are not limited to the following:

16             a)    Whether Defendant intentionally misrepresented the core-count of its

17                    Bulldozer Processors;

18             b)    Whether Defendant's conduct described herein was willful;

19             c)    Whether Defendant's conduct described herein constitutes a violation of

20   *also AMD FX-Series microprocessor family*, http://www.cpu-world.com/CPUs/Bulldozer/TYPE-
    FX-Series.html (last visited Oct. 26, 2015).

21        In addition, and as shown in Figure F, the Bulldozer Processors were marketed in the same

22   way. Marketing for each contains the core-count within the product name, product description,
    product details, and on the box. Moreover, AMD overstated the core-count for each processor in the

23   same way: AMD counted each module as two cores even though a Bulldozer module processing
    unit is not equal to a core. And, in one of its Form 10-Ks, AMD states the following about its FX

24   processors: "Our CPUs for desktop PC platforms also consist of the following: AMD FX processors
    based on the 'Bulldozer' and 'Piledriver' x86 multi-core architecture … ." *Advanced Micro Devices*

25   *- SEC Filing*,
    http://ir.amd.com/mobile.view?c=74093&v=202&d=3&id=aHR0cDovL2FwaS50ZW5rd2l6YXJkL

26   mNvbS9maWxpbmcueG1sP2lwYWdlPTg3NDQwODgmRFNFUT0xJlNFUT04JlNRREVTQz1TR

27   UNUSU9OX1BBR0UmZXhwPSZzdWJzaWQ9NTc%3D (last visited Oct. 26, 2015).

28

California's Consumers Legal Remedies Act (Cal. Civ. Code. §§ 1750, *et seq.*);

d) Whether Defendant's conduct described herein constitutes a violation of the Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*);

e) Whether Defendant's conduct described herein constitutes a violation of the False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et seq.*);

f) Whether Defendant's conduct described herein constitutes fraud in the inducement;

g) Whether Defendant's conduct described herein constitutes a breach of express warranty;

h) Whether Defendant's conduct described herein constitutes negligent misrepresentation; and,

i) Whether Defendant's conduct has caused them to be unjustly enriched.

52. **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct during transactions with Plaintiff and the Class.

53. **Adequate Representation**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class, and he has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class.

54. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect

1   to the Class as a whole. Defendant's policies challenged herein apply and affect the members of the

2   Class uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with

3   respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

4   55.   **Superiority**: This class action is also appropriate for certification because class

5   proceedings are superior to all other available methods for the fair and efficient adjudication of this

6   controversy and joinder of all members of the Class is impracticable. The damages suffered by the

7   individual members of the Class will likely be small relative to the burden and expense of

8   individual prosecution of the complex litigation necessitated by Defendant's wrongful conduct.

9   Thus, it would be virtually impossible for the individual members of the Class to obtain effective

10  relief from Defendant's misconduct. Even if members of the Class could sustain such individual

11  litigation, it would not be preferable to a class action because individual litigation would increase

12  the delay and expense to all parties due to the complex legal and factual controversies presented in

13  this Complaint. By contrast, a class action presents far fewer management difficulties and provides

14  the benefits of single adjudication, economy of scale, and comprehensive supervision by a single

15  court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be

16  ensured.

17  56.   Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class

18  Definition" based on facts learned through additional investigation and in discovery.

19
20  **FIRST CAUSE OF ACTION**
    **Violation of the Consumers Legal Remedies Act**
    **Cal. Civ. Code §§ 1750, *et seq.***
21  **(On Behalf of Plaintiff and the Class)**

22  57.   Plaintiff incorporates by reference the foregoing allegations as if fully set forth

23  herein.

24  58.   The Consumers Legal Remedies Act ("CLRA") applies to Defendant's actions and

25  conduct as described herein because it extends to transactions that are intended to result, or which

    have resulted, in the sale of goods or services to consumers.
26
27  59.   Defendant is a "person" as defined by Cal. Civ. Code § 1761(c).

28  60.   Plaintiff and each member of the Class are "consumers" as defined by Cal. Civ.

---

Code § 1761(a).

61.     Defendant's Bulldozer Processors are "goods" within the meaning of Cal. Civ. Code § 1761(a).

62.     As described herein, Defendant has engaged in deceptive practices, unlawful methods of competition, and/or unfair acts as defined by Cal. Civ. Code §§ 1750 *et seq.*, to the detriment of Plaintiff and the Class.

63.     Defendant, acting with knowledge, intentionally and unlawfully brought harm upon Plaintiff and the Class by representing that the Bulldozer Processors had "8-cores" when in fact Defendant's representations were false because the Bulldozer Processors have only four complete cores.

64.     Specifically, Defendant violated Cal. Civ. Code § 1750 in at least the following respects:

          a.     In violation of § 1770(5), by representing that the Bulldozer Processors had characteristics, ingredients, uses, benefits, or quantities which they did not have;

          b.     In violation of § 1770(7), by representing that the Bulldozer Processors were of a particular standard, quality, or grade of which they are not; and

          c.     In violation of § 1770(9), by advertising the Bulldozer Processors with the intent not to sell its goods as advertised.

65.     Defendant's unfair or deceptive acts or practices were capable of deceiving a substantial portion of the purchasing public.

66.     Defendant knew that it was unable or unwilling to manufacture, distribute, and sell processors with the advertised specifications at the time that it made representations claiming that the Bulldozer Processors had twice the number of cores that they actually had. Specifically, Defendant possessed technical materials and documentation and would have known that the Bulldozer modules were not equivalent to two cores as advertised.

67.     Once Defendant made specific public representations regarding the specifications of

the Bulldozer Processors, Defendant was under a duty to Plaintiff and the Class to disclose its inability or unwillingness to manufacture, distribute, and sell processors as advertised because:

      a.    Defendant was in a superior position to know the true state of facts about the specifications of the Bulldozer Processors;

      b.    Plaintiff and the Class could not reasonably have been expected to learn or discover that Defendant did not design the Bulldozer Processors with the advertised specifications;

      c.    Defendant knew that Plaintiff and the Class members could not reasonably have been expected to learn or discover that the Bulldozer Processors did not contain the core-count advertised; and

      d.    Defendant knew, and in fact intended, that Plaintiff and the Class members would rely on Defendant's representations regarding the processors' core-count in choosing whether or not to purchase the Bulldozer Processors.

68.    In failing to disclose its inability or unwillingness to design, manufacture, and sell processors with the advertised specifications, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

69.    The facts concealed or not disclosed by Defendant to Plaintiff and the Class, including that the Bulldozer Processors did not have any many cores as advertised, are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Bulldozer Processors.

70.    Plaintiff and the Class reasonably expect their processors to have the specifications equal to what Defendant advertised based upon Defendant's representations found online, the processors' packaging, and in the processors' names. Plaintiff's and Class members' expectations were reasonable under the circumstances.

71.    The core-count of the Bulldozer Processors are and were material selling points of Defendant's processors, and primary reasons to purchase the products.

72.    Plaintiff and members of the Class relied on the representations made by Defendant

1    about the core-count of the Bulldozer Processors when purchasing the products.

2        73.    Defendant's false representations about the core-count of the Bulldozer Processors

3    were acts likely to mislead Plaintiff and the members of the Class acting reasonably under the

4    circumstances.

5        74.    Through the misrepresentations and omissions detailed herein, Defendant wrongfully

6    induced Plaintiff and the other members of the Class to purchase the Bulldozer Processors when

7    they otherwise would not have purchased the processors or would have only agreed to purchase

8    them at a lower price.

9        75.    As a direct and proximate result of Defendant's violation of Cal. Civ. Code §§ 1750,

10   *et seq.*, Plaintiff and each Class member have suffered harm in the form of paying monies to

11   Defendant without receiving the entire benefit of his or her bargain.

12       76.    Plaintiff and the members of the Class are likely to purchase processors with AMD

13   technology in the future and require an injunction requiring AMD to truthfully advertise its

14   processors' specifications. Specifically, because AMD and its competitor Intel manufacture and

15   distribute effectively all consumer CPUs, Plaintiff and members of the Class will be exposed to

16   AMD's deceptive marketing in the future and are effectively left with no other option but to

17   purchase products from AMD or Intel.

18       77.    Under Cal. Civ. Code § 1780(a) and (b), Plaintiff, individually and on behalf of the

19   Class, seeks an injunction requiring Defendant to cease and desist the illegal conduct alleged in this

20   Complaint, and all other appropriate remedies for its violations of the CLRA. For the sake of clarity,

21   Plaintiff explicitly disclaims any claim for damages under the CLRA at this time.

22                        **SECOND CAUSE OF ACTION**
                  **Violations of California's Unfair Competition Law**
23                **Cal. Bus. & Prof. Code §§ 17200, *et seq.***
                       **(On Behalf of Plaintiff and the Class)**
24

25       78.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth

26   herein.

27       79.    California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code §§ 17200, *et*

28   *seq.*, protects both consumers and competitors by promoting fair competition in commercial

1  markets for goods and services.

2      80.    The UCL prohibits any unlawful, unfair, or fraudulent business act or practice,

3  including the employment of any deception, fraud, false pretense, false promise, misrepresentation,

4  or the concealment, suppression, or omission of any material fact. A business practice need only

5  meet one of the three criteria to be considered unfair competition.

6      81.    The specifications of a consumer product is a material term of any transaction

7  because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a

8  product. Any deception or fraud related to the specifications of a product is materially misleading.

9      82.    As described herein, Defendant has engaged in deceptive business practices, as

10  defined by the UCL, by misrepresenting the core-count of its Bulldozer Processors.

11      83.    Defendant's representations were, in fact, false. Defendant's processors do not

12  actually contain the advertised core-count. In particular, Defendant's Bulldozer Processors contain

13  four "modules" (*i.e.*, four complete cores) which are materially distinct from "8-cores" that are

14  advertised.

15      84.    Defendant has violated the fraudulent prong of the UCL by knowingly making false

16  representations to consumers—including Plaintiff and the Class—regarding the number of cores in

17  its Bulldozer Processors. These representations were made in an effort to convince consumers to

18  purchase the Bulldozer Processors.

19      85.    Reasonable consumers are likely to be, and Plaintiff and the Class were, deceived by

20  Defendant's misrepresentations about the specifications of the Bulldozer Processors.

21      86.    Defendant also violated the UCL's unfair prong by causing substantial injury to

22  consumers through its fraudulent conduct described above. The injuries caused by Defendant's

23  unfair conduct are not outweighed by any countervailing benefits to consumers or competition, and

24  the injury is one that consumers themselves could not reasonably have avoided. Given the

25  information asymmetry between Defendant and consumers regarding the true specifications of the

26  Bulldozer Processors, Defendant knew or had reason to know that Plaintiff and the Class could not

27  have reasonably known or discovered the falsity of representations about the actual specifications of

28

1  the Bulldozer Processors.

2      87.    Defendant's fraudulent and unfair conduct occurred during the marketing,

3  distribution, and sale of consumer-grade CPUs, and therefore occurred in the course of Defendant's

4  business practices.

5      88.    Defendant's fraudulent and unfair conduct directly and proximately caused Plaintiff

6  and the Class actual monetary damages in the form of the price paid for their Bulldozer

7  Processors—typically between $150 and $300—or, at least, the difference between what they paid

8  for the processors and their actual value.

9      89.    But for Defendant's conduct as described herein, Plaintiff and the Class would not

10  have purchased the Bulldozer Processors, or would have paid substantially less for them.

11      90.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order (1) requiring

12  Defendant to cease the unfair practices described herein; (2) requiring Defendant to restore to

13  Plaintiff and each Class member any money acquired by means of unfair competition (restitution);

14  and, (3) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

15  

**THIRD CAUSE OF ACTION**
**Violation of False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500 *et seq.***
**(On Behalf of Plaintiff and the Class)**

16

17

18      91.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

19      92.    California's False and Misleading Advertising Law ("FAL") prohibits corporations

20  from intentionally disseminating advertisements for products or services that are "unfair, deceptive,

21  untrue, or misleading." Cal. Bus. & Prof. Code §17500.

22      93.    As depicted in Figures 1–8 and detailed throughout this Complaint, Defendant has

23  disseminated unfair, deceptive, untrue, and misleading advertisements that overstate the core-count

24  of its Bulldozer Processors. As detailed in Section II above, these advertisements are false and

25  misleading and were designed to convince consumers to purchase the processors. In short,

26  Defendant's advertisements are false because they advertise specifications that Defendant knew the

27  processors did not have (*i.e.*, AMD knew a Bulldozer module is not equal to two complete cores).

28      94.    A reasonable person is likely to be deceived by Defendant's advertisements.

95.     Defendant knew or should have known when creating and disseminating these advertisements that they contained materially false and misleading information. As the developers, engineers, testers, and distributors of the Bulldozer Processors, Defendant is intimately familiar with the processors' specifications. Thus, it is reasonable to infer that Defendant is (and was) aware of the fact that the Bulldozer Processors did not have any many cores as advertised.

96.     Defendant's conduct directly and proximately caused Plaintiff and the Class actual monetary damages in the form of the price paid for the Bulldozer Processors—typically between $150 and $300—or, at least, the difference between what they paid for the processors and their actual value.

97.     Plaintiff seeks an order (1) requiring Defendant to cease the false advertising practices described herein; (2) requiring Defendant to restore to Class members any money acquired by means of false advertising (restitution); and, (3) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

## FOURTH CAUSE OF ACTION
### Fraud in the Inducement
### (On Behalf of Plaintiff and the Class)

98.     Plaintiff incorporates by reference the foregoing allegations as if fully stated herein.

99.     As described with particularity herein, Defendant has designed, overseen, and disseminated false and misleading advertisements for its Bulldozer Processors. This conduct includes, but is not limited to, Defendant promoting and advertising that the Bulldozer Processors have "8-cores" when Defendant knew or should have known that the processors only have four complete cores.

100.    By committing the acts alleged in this Complaint, Defendant has designed and disseminated untrue and misleading statements through fraudulent advertising in order to sell or induce members of the public to purchase its Bulldozer Processors.

101.    The number of cores within a CPU is a material term of any transaction for a processor because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a particular CPU. Any deception of fraud related to the core-count for a processor is

1    materially misleading.

2         102.    Misrepresentations regarding a processor's core-count specifications are likely to

3    mislead a reasonable consumer who is acting reasonably under the circumstances.

4         103.    Defendant knew or should have known of the falsity of the representations it made

5    regarding the core-count of its Bulldozer Processors.

6         104.    Defendant intended that the deceptive and fraudulent misrepresentations it made

7    would induce consumers to rely upon them and act by purchasing its Bulldozer Processors.

8         105.    Defendant received money as a result of Plaintiff and members of the Class monies

9    purchasing a product that did not meet the advertised specifications. Accordingly, Plaintiff and the

10   members of the Class have suffered injury in fact and lost money in justifiable reliance on

11   Defendant's misrepresentations of material fact.

12        106.    In deceiving Plaintiff and the Class by misrepresenting the actual core-count

13   specifications of the Bulldozer Processors, and inducing Plaintiff and the Class to proffer payment

14   based on those misrepresentations, Defendant has engaged in and has, and/or continues to have,

15   direct knowledge of fraudulent practices designed to mislead and deceive consumers.

16        107.    Plaintiff and the Class have suffered harm as a proximate result of Defendant's

17   violations of law and wrongful conduct.

18        108.    Plaintiff, on behalf of himself and the Class, seeks damages from Defendant's

19   unlawful conduct.

20                          **FIFTH CAUSE OF ACTION**
                           **Breach of Express Warranties**
21                       **(On Behalf of Plaintiff and the Class)**

22        109.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth

23   herein.

24        110.    Pursuant to California Commercial Code § 2313, Defendant's sale of its Bulldozer

25   Processors included express warranties created by Defendant's affirmations of fact, made through

26   the marketing materials and advertisements displayed on retailers' websites, on the processors'

27   packaging, and in the processors' product description.

28

111.    Defendant's express warranties included affirmations of fact and promises that the Bulldozer Processors would conform to the core-count specifications represented on retailers' websites, on the processors' packaging, and in the processors' product description.

112.    Specifically, Defendant's statements included affirmations of fact and promises that the Bulldozer Processors have "8-cores." As such, Defendant expressly warranted that the Bulldozer Processors would conform to such specifications.

113.    Defendant, under the California Commercial Code, was obligated to deliver the Bulldozer Processors as advertised, promised, and/or described.

114.    Defendant breached its express warranties because the processors did not conform to the core-count specifications advertised on retailers' websites, on the processors' packaging, in the processors' product description.

115.    Defendant's failure to provide Plaintiff and the Class members with processors that conform to advertised core-count specifications constitutes a breach of the express warranty to include such core-count specifications with the Bulldozer Processors.

116.    Plaintiff and the members of the Class relied on Defendant's affirmations, promises, and descriptions when they purchased the Bulldozer Processors. But for Defendant's affirmations and promises, Plaintiff and the Class would not have purchased the Bulldozer Processors, or would have only agreed to purchase them at a lower price. As such, Defendant's breach of express warranties injured Plaintiff and the Class because they purchased a product of diminished value— processors that do not have the core-count specifications as described by Defendant's affirmations and promises.

117.    Because the processors that Plaintiff and the Class members received did not have the core-count specifications as expressly warranted and represented by Defendant, Plaintiff and the members of the Class have been damaged insofar as they did not receive the benefit of their bargain.

118.    By serving this Complaint, Plaintiff and the Class hereby give Defendant notice that it has breached the express warranties described above. Plaintiff and the members of the Class

request maximum damages as provided by the California Commercial Code.

**SIXTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(On Behalf of Plaintiff and the Class)**

119.    Plaintiff incorporates by reference the foregoing allegations.

120.    Through its marketing materials, Defendant represented to Plaintiff and the members of the Class that the Bulldozer Processors have "8-cores."

121.    Plaintiff and the members of the Class were exposed to representations made by Defendant regarding the Bulldozer Processors having eight cores. Those representations were repeated on and through various websites, including amd.com, Newegg.com, and Amazon.com, and on the Bulldozer's packaging.

122.    Those representations were false, and at the time such false statements were made, Defendant knew or should have known of their falsity or, at the very least, Defendant acted with negligence and carelessness in ascertaining the truth of the statements. Defendant knew or should have known that they were unwilling or unable to include the qualities and specifications represented in its marketing materials (online and on-box). Defendant did not have any reasonable ground for believing its statements to be true.

123.    Defendant intended that Plaintiff and the members of the Class rely on its misrepresentations and omissions by purchasing Bulldozer Processors.

124.    Defendant understood, and intended, that their current and future customers would see the representations discussed herein.

125.    Defendant had a duty to not make the above-described misrepresentations, and to take steps to correct any misrepresentations before Plaintiff and the members of the Class purchased the Bulldozer Processors.

126.    However, Defendant did not take any steps to correct, clarify its false representations about the qualities and specifications of the Bulldozer Processors.

127.    Plaintiff and Class Members justifiably relied on Defendant's misrepresentations by purchasing Bulldozer Processors, and were unaware of the falsity of Defendant's statements at the

1    time they were made.

2    128.   As a direct and proximate result of Defendant's misrepresentations, Plaintiff and the

3    members of the Class suffered damages in the form of monies paid to purchase Defendant's product

4    when they otherwise would not have purchased the processors or would only have agreed to

5    purchase them at a lower price.

6                         **SEVENTH CAUSE OF ACTION**
                              **Unjust Enrichment**
7                      **(On Behalf of Plaintiff and the Class)**

8    129.   Plaintiff incorporates by reference the foregoing allegations as if fully set forth

9    herein.

10   130.   Plaintiff and the Class have conferred a benefit upon Defendant in the form of the

11   money Defendant received from them for the purchase of the Bulldozer Processors, which did not

12   have the core-count specifications as Defendant promised.

13   131.   Defendant appreciates and/or has knowledge of the benefits conferred upon it by

14   Plaintiff and the Class.

15   132.   Under principles of equity and good conscience, Defendant should not be permitted

16   to retain the money obtained from Plaintiff and the members of the Class, which Defendant has

17   unjustly obtained as a result of its deceptive and misleading advertising.

18   133.   Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any

19   money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

20                         **PRAYER FOR RELIEF**

21   WHEREFORE, Plaintiff Tony Dickey on behalf of himself and the Class respectfully

22   requests that the Court enter an order:

23   A.   Certifying this case as a class action on behalf of the Class defined above, appointing

24   Tony Dickey as representative of the Class, and appointing his counsel as class counsel;

25   B.   Declaring that Defendant's actions, as set out above, violate the CLRA (Cal. Civ.

26   Code §§ 1750, *et seq.*); UCL (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); the FAL (Cal. Bus. & Prof.

27   Code §§ 17500, *et seq.*), and constitute fraud in the inducement, breach of express warranties,

28

1   negligent misrepresentation, and unjust enrichment;

2        C.      Awarding damages, including statutory and punitive damages where applicable, to

3   Plaintiff and the Class in an amount to be determined at trial;

4        D.      Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys'

5   fees;

6        E.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent

7   allowable;

8        F.      Awarding such other injunctive and declaratory relief as is necessary to protect the

9   interests of Plaintiff and the Class; and

10       G.      Awarding such other and further relief as the Court deems reasonable and just.

11                              **DEMAND FOR JURY TRIAL**

12       Plaintiff demands a trial by jury for all issues so triable.

13                                      Respectfully submitted,

14   Dated:  October 26, 2015            **TONY DICKEY**, individually and on behalf of all
15                                       others similarly situated,

16                                       By:   /s/ Samuel M. Lasser
                                               One of Plaintiff's Attorneys

17
18                                       Samuel M. Lasser (SBN – 252754)
                                         slasser@edelson.com
19                                       EDELSON PC
                                         1934 Divisadero Street
20                                       San Francisco, California 94115
                                         Tel: 415.994.9930
21                                       Fax: 415.776.8047

22                                       Rafey S. Balabanian*
                                         rbalabanian@edelson.com
23                                       Alexander T.H. Nguyen*
                                         anguyen@edelson.com
24                                       Amir C. Missaghi*
                                         amissaghi@edelson.com
25                                       EDELSON PC
                                         350 North LaSalle Street, Suite 1300
26                                       Chicago, Illinois 60654
                                         Tel: 312.589.6370
27                                       Fax: 312.589.6378

28                                       *Pro hac vice admission to be sought
                                         *Attorneys for Plaintiff and the Putative Class*