Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Todd Logan (SBN 305912)
tlogan@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| TONY DICKEY and PAUL PARMER, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> ADVANCED MICRO DEVICES, INC., a Delaware corporation, <br><br> *Defendant*. | Case No. 4:15-cv-04922-HSG <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT** <br><br> Judge:  Hon. Haywood S. Gilliam, Jr. <br> Date:   October 3, 2019 <br> Time:   2:00 p.m. |

# TABLE OF CONTENTS

I.    INTRODUCTION ...............................................................................................1

II.   BACKGROUND .................................................................................................2

    A.    Plaintiffs' Allegations ............................................................................2

    B.    The Procedural History of the Litigation ...............................................3

    C.    Settlement Discussions ...........................................................................4

III.  THE TERMS OF THE SETTLEMENT AGREEMENT ...........................................5

IV.   CLASS CERTIFICATION NEED NOT BE REVISITED……………………………6

V.    THE PROPOSED SETTLEMENT MERITS PRELIMINARY
    APPROVAL ....................................................................................................12

VI.   THE NOTICE PLAN SHOULD BE APPROVED IN FORM AND
    SUBSTANCE ...................................................................................................15

VII.  CONCLUSION ...............................................................................................15

## **TABLE OF AUTHORITIES**

**United States  Courts Of Appeals Cases**

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) .................................................................. 10

*In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011) ................ 15

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ................................................. 14

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ........................................... 12, 17

**United States District Court Cases**

*Austin v. Foodliner, Inc.*, No. 16-cv-07185-HSG, 2018 WL 3956208
    (N.D. Cal. Aug. 17, 2018)............................................................................................... 11

*Barnard v. CorePower Yoga LLC*, No. 16-cv-03861, 2017 WL 3977384
    (N.D. Cal. Sept. 11, 2017)............................................................................................... 14

*Black v. T-Mobile USA, Inc.*, No. 17-cv-04151-HSG, 2019 WL 499748
    (N.D. Cal. Feb. 8, 2019).................................................................................................. 16

*Covillo v. Specialtys Cafe*, No. c-11-00594, 2014 WL 954516
    (N.D. Cal. Mar. 6, 2014) ................................................................................................. 12

*De La Torre v. CashCall, Inc.*, No. 08-cv-03174-MEJ, 2017 WL 2670699
    (N.D. Cal. June 21, 2017) ................................................................................................ 17

*Ebarle v. Livelock Inc.*, No. 15-cv-00258-HSG, 2016 WL 234364
    (N.D. Cal. Jan. 20, 2016) ................................................................................................ 15

*Esomonu v. Omnicare, Inc.*, No. 15-cv-02003-HSG, 2018 WL 3995854
    (N.D. Cal. Aug. 21, 2018)................................................................................................ 11

*Fraser v. Asus Computer Intern*, No. C 12-00652 WHA, 2012 WL 6680142
    (N.D. Cal. Dec. 21, 2012) ................................................................................................ 15

*Guttmann v. Ole Mexican Foods, Inc.*, No. 14-cv-0485-HSG, 2015 WL 13226627
    (N.D. Cal. Nov. 13, 2015)................................................................................... 10, 12, 15

*Harris v. Vector Mktg. Corp.*, No. 08-cv-5198, 2011 WL 1627973
    (N.D. Cal. Apr. 29, 2011) .................................................................................. 11, 12, 15

*In re Lenovo Adware Litigation*, No. 15-md-02624, 2018 WL 6099948
    (N.D. Cal. Nov. 21, 2018).................................................................................. 10, 11, 16

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078
    (N.D. Cal. 2007)............................................................................................... 10, 13

*In re TD Ameritrade Account Holder Litig.*, 2011 WL 4079226
    (N.D. Cal. Sept. 13, 2011) ............................................................................................ 13

*Mendez v. C-Two Group, Inc.*, No. 13-cv-05914-HSG, 2017 WL 1133371
    (N.D. Cal. Mar. 27, 2017)..................................................................................... 8, 10, 13

*Noroma v. Home Point Fin. Corp.*, No. 17-cv-07205, 2019 WL 1589980
    (N.D. Cal. Apr. 12, 2019) .................................................................................... 9, 11, 13

*Ralston v. Mortgage Investors Group, Inc.*, No. 5:08-CV-00536,
2013 WL 12175069 (N.D. Cal. June 19, 2013) ................................................................ 9

*Satchell v. Fed. Exp. Corp.*, No. 03-cv-2659 SI, 2007 WL 1114010
(N.D. Cal. Apr. 13, 2007) .......................................................................................... 11

**Other Authorities**

Class Action Fairness Act, 28 U.S.C. § 171 ................................................................ 18

Consumers Legal Remedies Act, Cal Civ. Code §§ 1750 *et seq* ................................ 1, 4

False Advertising Law, Cal. Bus. & Prof. Code § 17500 .......................................... 1, 4

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................ 16

Unfair Competition Law, Cal Bus. & Prof. Code §§ 17200, *et seq.* ........................... 1, 4

## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on October 3, 2019, at 2:00 p.m., or at such other time as may be set by the Court, Plaintiffs Tony Dickey and Paul Parmer will appear, through counsel, before the Honorable Haywood S. Gilliam, Jr., or any Judge sitting in his stead, in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA 94612, and then and there, respectfully move the Court, pursuant to Federal Rule of Civil Procedure 23(e), to grant preliminary approval of a proposed class action settlement reached between Plaintiffs and Defendant Advanced Micro Devices, Inc.

Plaintiffs' motion is based upon this Notice, the Memorandum of Points and Authorities filed herewith, the exhibits attached thereto, including the Parties' proposed class action settlement agreement, the Declaration of Todd Logan filed simultaneously herewith, and the record in this matter, along with any oral argument that may be presented to the Court and evidence submitted in connection therewith.

Respectfully Submitted,

**TONY DICKEY and PAUL PARMER,**
individually and on behalf of all others similarly situated,

Dated: August 23, 2019

By: /s/ Todd Logan
One of Plaintiffs' Attorneys

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Todd Logan (SBN 305912)
tlogan@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs and the Class*

## I.    INTRODUCTION

In 2015, Plaintiff Tony Dickey filed a class action complaint on behalf of purchasers of Advanced Micro Devices, Inc.'s ("AMD" or "Defendant") Bulldozer line of central processing units ("CPUs"). Dickey alleged that while AMD had advertised its Bulldozer CPUs as containing eight processors, these CPUs—in reality—contained only four. Dickey alleged that this misrepresentation was material and problematic on several fronts, including that the "eight" advertised cores could not operate independently or simultaneously multitask as consumers would expect. Based on these alleged misrepresentations, and together with Plaintiff Paul Parmer, in 2016 Plaintiffs filed a Second Amended Class Action Complaint alleging that AMD violated California's Consumers Legal Remedies Act ("CLRA"), Cal Civ. Code §§ 1750 *et seq.*, California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code §§ 17200, *et seq.*, California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, and committed fraud in the inducement, breach of express warranties, and negligent misrepresentation.

After nearly four years of hard-fought litigation, including adversarial class certification, the Parties have now agreed to a class action settlement that is an excellent result for the case. At base, the settlement provides substantial cash relief to the Class from a **$12.1 million, non-reversionary common fund** of which each eligible claiming class member will receive a *pro rata* share (on a per-purchased-chip basis). The value of the proposed common fund represents a recovery of approximately **20%** of the damages Plaintiffs would have sought to prove at trial on behalf of the certified class. And, based on their experience, Class Counsel estimate that claiming class members are likely to receive **more than 50%** of the value of their certified claims had they prevailed at trial. Given the risks and expenses that further litigation would pose in this case, such a result is well within the range of approval.

The strength of the settlement can also be measured by the path the parties took to reach it. The case was extensively litigated, with the Parties briefing three motions to dismiss, exchanging substantial fact and expert discovery, including the production of thousands of pages of documents, depositions, and the engagement of at least six (6) experts (and formal disclosure of four (4) expert witness reports). And, of course, the Parties also briefed the issue of class

certification, which Plaintiffs ultimately prevailed on. The substantial amount of motion practice, coupled with the wide-ranging discovery that was conducted, should leave the Court with no doubt that the instant settlement was reached only after the Parties had engaged with the case's key issues sufficient to value the claims alleged.

When the time for settlement talks ultimately came – which was after Plaintiffs achieved class certification, and the Parties were marching towards summary judgment briefing – the Parties conducted them at arms-length through a mediation with the Honorable James F. Holderman of JAMS, a retired Chief Judge of the Northern District of Illinois. The mediation took place on May 9, 2019, in Chicago. Judge Holderman did his level best to caucus between the Parties in an effort to get them to mutually agree to a final settlement figure. Midway through the afternoon, the Parties still had a substantial gulf between them. Judge Holderman then encouraged counsel to (twice) sit down face-to-face, late in the day, to have a frank discussion as to the comparative strengths and weaknesses of the claims. Those face-to-face meetings, combined with the skilled aid of Judge Holderman, allowed the parties to resolve their impasse and reach an all-in common fund figure. It then took an additional three months for the Parties to hammer out the finer points of their agreement, as well as to receive responses to the many subpoenas Plaintiffs issued on various venders for class-member contact information. The final result of all those efforts is the Settlement Agreement that is now before the Court for which Plaintiffs now seek preliminary approval.

Accordingly, Plaintiffs respectfully request that the Court (i) grant preliminary approval of the Settlement, (ii) confirm its appointment of Plaintiffs as Class Representatives and their counsel as Class Counsel, (iii) approve the form and manner of notice to class members, and (iv) schedule the final approval hearing.

## II.    BACKGROUND

### A.    Plaintiffs' Allegations

Defendant AMD is a global semiconductor manufacturer and the second largest supplier of CPUs found in personal computers. Second Amended Complaint ("SAC") ¶ 20. For over forty years, AMD has been in a market share battle with Intel Corporation over these products. AMD,

consequently, tailors its marketing schemes to emphasize any edge its CPUs can possibly offer. *Id.* ¶ 21. Particularly in the last decade, the companies began to focus their advertising on the number of cores in their CPUs. *Id.* ¶ 22. In 2010, for example, AMD promised that "'the power of four processor cores on a single chip deliver[s] industry-leading multitasking performance.'" *Id.* ¶ 26. Plaintiffs' theory was that through this type of advertising, AMD signaled that the number of processors in a CPU equated with its performance, while at the same time reflecting the wide-spread (and its own) understanding that core count is an important factor for consumers. But according to Plaintiffs, when AMD debuted its Bulldozer line of CPUs, this marketing gambit went too far.

AMD's Bulldozer CPU line was consistently advertised as having eight cores. *Id.* ¶ 37. This specification was prominent on both AMD's online and on-packaging advertisements, and was the product line's focal selling point. *Id.* ¶ 32. To promote the Bulldozer line and differentiate its product from competitors, AMD specifically announced that it was the "world's first 8 core CPU"— a strategy that highlighted how its product outmatched those of its top competitor, which claimed only six cores. *Id.* ¶¶ 7, 30, 32. Plaintiffs alleged, however, that AMD's Bulldozer CPUs do not actually contain eight cores. *See* SAC ¶ 24-29. According to Plaintiffs, the "cores" in the Bulldozer line are actually sub-processors that cannot operate and simultaneously multitask as actual cores. *Id.* ¶ 38. This fundamental difference (among others), Plaintiffs alleged, amounted to deception. *Id.* ¶ 30.

In particular, Plaintiffs claimed that they had viewed and relied on AMD's allegedly false advertisements when they were enticed to purchase Defendant's CPUs. *Id.* ¶¶ 50-65. Plaintiff Dickey allegedly saw representations of AMD's CPUs that said they were "'the industry's first and only native 8-core desktop processor for unmatched multitasking and pure core performance.'" *Id.* ¶ 51. However, according to Dickey, this CPU did not perform as well as a CPU would with eight independent cores. *Id.* ¶ 53. Plaintiff Parmer allegedly had a similar experience. Before Parmer purchased one of AMD's Bulldozer CPUs, he allegedly viewed advertising that led him to believe that the Bulldozer CPUs would have eight cores independent or capable of performing at full speed. *Id.* ¶ 59. Both Plaintiffs alleged that, had they known

these CPUs did not truly have eight-core capabilities, they would not have purchased the product in the first place or paid as much for it as they did. *Id.* ¶¶ 55, 63.

### B.    The Procedural History of the Litigation

To obtain relief from AMD's allegedly deceptive practices, on October 26, 2015, Plaintiff Dickey filed a putative class action against AMD in the United States District Court for the Northern District of California. Dkt. 1. Dickey alleged that Defendant's advertisements of Bulldozer CPUs violated California's Consumers Legal Remedies Act ("CLRA"), Cal Civ. Code § 1761(c), California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code §§ 17200, *et seq.*, California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, and further amounted to common law fraud in the inducement, breach of express warranties, and negligent misrepresentation. *Id.*

AMD moved to dismiss this complaint on December 21, 2015, Dkt 27, and after briefing and argument, the Court granted AMD's motion to dismiss on April 7, 2016, Dkt. 46. Dickey and Parmer, together, filed a First Amended Complaint (the "FAC") on May 5, 2016, which removed the claim for unjust enrichment, but realleged all other causes of action. Dkt. 50. AMD again moved to dismiss on May 26, 2016. Dkt. 52. After briefing and argument on October 31, 2016, the Court again granted AMD's motion to dismiss with leave to amend. Dkt. 71. On November 21, 2016, Plaintiffs submitted their Second Amended Complaint, realleging all causes of action that were included in the FAC. Dkt. 76. On June 14, 2017, after briefing and argument, the Court granted in part, and denied in part, the motion to dismiss. Dkt. 96.

Shortly thereafter, discovery commenced. Over the next ten months, the Parties exchanged substantial fact and expert discovery, including the production of documents, the exchange of multiple sets of interrogatories, the depositions of Plaintiffs, and the disclosure of expert reports. *See* Exhibit 1, Declaration of Todd Logan ("Logan Decl.") ¶¶ 3-4. Specifically, the Parties collectively produced over 6,000 pages of documents, collectively responded to fifty-five (55) interrogatories, conducted full-day depositions of Tony Dickey and Paul Parmer on January 8, 2018, and January 16, 2018, respectively, and Defendant disclosed the expert reports of Dr. Thomas Conte, Dr. Dominique Hanssens, Kishore Mulchandani, and Justin McCrary. *See*

Dkt. 122. The Parties also engaged in several discovery disputes, including motion practice related to the disclosure and filing of expert reports. *See* Dkt. 110; Dkt. 111.

Following these discovery efforts, on March 27, 2018, Plaintiffs filed a Motion for Class Certification, which sought to certify a class of consumers under California's Unfair Competition Law and False Advertising Law. Dkt. 118. Approximately nine months later, the Court granted Plaintiff's motion on January 17, 2019 and certified a class comprised of "all individuals who purchased one or more of the following AMD computer chips either (1) while residing in California or (2) after visiting the AMD.com website: FX-8120, FX-8150, FX-8320, FX-8350, FX-8370, FX-9370, and FX-9590.

In the months following the Court's ruling, the Parties began marching towards summary judgment briefing. Plaintiffs vetted more than a dozen potential technical experts and ultimately formally engaged two leading experts on CPU microarchitecture, Dr. Phillip Emma and Dr. Vojin Oklobdzija, who in total produced four preliminary written expert reports—two affirmative reports and two rebuttal reports. Logan Decl. ¶ 4. On March 28, 2019 and then on June 3, 2019, amended case schedules were entered, under which fact discovery would close in September 2019. Dkt. 135.

## C.      Settlement Discussions

The Parties first engaged in settlement discussions in August 2016. Logan Decl. ¶ 6. At that time, the Parties participated in a pre-mediation phone call with the Honorable Morton Denlow, a former Chief Magistrate Judge of the Northern District of Illinois. *Id.* That initial call quickly revealed, however, that any negotiations would be premature: the Parties had vastly divergent views of the merits of the case. Once this became apparent, and at Judge Denlow's suggestion, the Parties agreed to cancel the mediation, but committed to revisiting settlement talks at a later date, if appropriate. *Id.*

After the extensive discovery and motion practice described in Section II.B, including Plaintiffs' successful Motion for Class Certification, the Parties revisited settlement discussions in January 2019. *Id.* The Parties ultimately agreed to attend a full-day mediation with the Honorable James F. Holderman. *Id.* On May 9, 2019, the Parties participated in a full-day

mediation before Judge Holderman, ultimately resulting in the Settlement Agreement that is now before the Court. *Id.*; Exhibit 2, Class Action Settlement Agreement ("Agreement").

## III.    THE KEY TERMS OF THE SETTLEMENT AGREEMENT

For the Court's convenience, the key terms of the Agreement are briefly summarized as follows:

**A.    Settlement Class Definition:** The Settlement Class is defined as follows: "All persons who purchased one or more of the following AMD computer chips either (1) while residing in California or (2) after visiting the AMD.com website: FX-8120, FX-8150, FX-8320, FX-8350, FX-8370, FX-9370, and FX-9590."[1] Agreement § 1.28.[2]

**B.    Settlement Benefits:** Defendant has agreed to establish a **$12,100,000.00** Settlement Fund from which each settlement class member with an approved claim shall be entitled to a *pro rata* portion (after deducting the Settlement Administration expenses, any Fee Award, any incentive award for the Class Representatives, and other amounts payable under the Agreement). *Id.* § 2.1. No portion of the Settlement Fund will revert to Defendant. *Id.* Any class member checks not cashed within 90 days of issuance will be either be placed in a Second Distribution Fund or donated to a Court-approved *cy pres* recipient. *Id.*

**C.    Release:** In exchange for the monetary relief described above, AMD and any of its related entities will receive a release of all claims, "whether based on California's Unfair Competition Law, California's False Advertising Law, California's Consumer Legal Remedies Act, or on claims of fraudulent inducement, breach of express warranty, or negligent misrepresentation, or other federal, state, local, statutory or common law or any other law, rule or

---

[1]    Excluded from the Settlement Class are (1) any Judge or Magistrate presiding over this action and members of their families, (2) the defendant, defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which the defendant or its parents have a controlling interest and their current or former officers, directors, and employees, (3) persons who properly execute and file a timely request for exclusion from the class, and (4) the legal representatives, successors or assigns of any such excluded persons. *See* Agreement § 1.28.

[2]    The sole difference between the Settlement Class definition and class definition certified the Court, *see* Dkt. 135 at 13, is that the Settlement Class is comprised of "**all persons**" instead of merely "all individuals." This modest tweak is meant to allow businesses, in addition to individuals, who purchased Defendant's chips on the same, to participate in the settlement.  The change has no material affect on any aspect of the class certification analysis.

regulation" that arise "out of any marketing materials, advertising, descriptions, facts, transactions, events, matters, occurrences, acts, disclosures, statements, representations, omissions or failures to act regarding the number of cores in AMD's FX-8120, FX-8150, FX-8320, FX-8350, FX-8370, FX-9370, and FX-9590 processors, including all claims that were brought or could have been brought in the Action relating to representations about those CPUs." *Id.* § 1.23.

This release encompasses the claims, products, and conduct that Plaintiffs identified in this lawsuit. While Plaintiffs moved for class certification of only their UCL and FAL claims, the settlement releases all claims Plaintiffs alleged in their Second Amended Complaint, as well as any other "other federal, state, local, statutory or common law or any other law, rule or regulation." This release is concededly broader than the specific claims certified by the Court, but it applies only to the alleged misconduct (and specific products) challenged in this lawsuit, and is the reasonable—indeed, nearly inevitable—result of arms-length negotiations underlying a nationwide class action resolution that delivers "global peace" to the Defendant in exchange for a substantial cash recovery in favor of the Class.

**D.    Class Notice:** The Settlement Fund will be used to pay the costs of sending the notice set forth in the Agreement and any other notice as required by the Court, as well as all costs of administration of the Settlement. *Id.* § 2.1. Angeion Group, a third-party administrator, will send class notices via U.S. Mail and/or email based on records subpoenaed from vendors. *Id.* §§ 1.27, 4.1(a)-(c). Angeion will also implement a digital media campaign targeting potential class members. *Id.* § 4.1(e). In accordance with Rule 23, the notice will include: the nature of the action, a summary of the settlement terms, and instructions on how to object to and opt out of the settlement, including relevant deadlines. *Id.* § 4.2.

**E.    Opt-Out Deadline:** Any class member who does not wish to participate in the settlement must submit a request for exclusion no later than forty-five (45) days after the Notice Date. *Id.* § 1.18.

**F.      Incentive Award Requests:** With no consideration having been given or received, Plaintiffs have unilaterally agreed to limit any requests for incentive awards to no more than seven thousand five hundred dollars ($7,500) each. *Id.* § 8.3

**G.      Attorneys' Fees and Expenses Requests:** Without the Parties having discussed the issue of attorneys' fees at any point in their negotiations, and with no consideration given or received, Class Counsel have unilaterally agreed to limit any petition for attorneys' fees to no more than 30 percent (30%) of the Settlement Fund. *Id.* § 8.1. Any fee award request by Class Counsel, of course, will be subject to the Court's approval and the Defendant is free to object to the requested attorneys' fees.[3]

## IV.      CLASS CERTIFICATION NEED NOT BE REVISITED

The Court need not revisit its class certification Order during preliminary approval if "no facts that would affect the Court's reasoning have changed." *Mendez v. C-Two Group, Inc.*, No. 13-cv-05914-HSG, 2017 WL 1133371, at *3 (N.D. Cal. Mar. 27, 2017). This is particularly true where the proposed settlement provides relief for "the same persons" as the certified class. *Ralston v. Mortgage Investors Group, Inc.*, No. 5:08-CV-00536, 2013 WL 12175069, at *1 (N.D. Cal. June 19, 2013).

Here, the certified class and the settlement class are practically identical. The sole, minor difference is that the settlement provides relief for "persons," whereas the certified class covered only "individuals." *Compare* Dkt. 135 at 13; Agreement § 1.28. This difference will allow businesses, in addition to individuals, to participate in the settlement. That difference aside, in

---

[3]      In compliance with this District's Procedural Guidance for Class Action Settlements, Class Counsel report that this is a common fund case in which Class Counsel anticipate basing their fees exclusively upon the monetary relief (*i.e.*, the $12.1 million common fund) provided to the Class. As of the date of the signing of this brief, Edelson PC has put approximately 1,980 hours of work into this case at a blended hourly rate of approximately $475, indicating a present lodestar of approximately $945,000. Upon Final Approval, Class Counsel anticipate seeking attorneys' fees based primarily on a percentage-of-the-fund analysis, anticipate seeking no more than 30% of the common fund as a fee award, and in any event anticipate that any lodestar multiplier will not exceed 4.0. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 and n.6 (9th Cir. 2002) (approving 27% fee award cross-checked with a lodestar multiplier of 3.65, citing *3 NEWBERG* § 14.03 at 14-5 for the proposition that "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied"). Class counsel also intends to seek payment of costs and expenses, including expert fees.

---

the months since the Court granted class certification, Class Counsel and the Class Representatives have continued to vigorously prosecute this case on behalf of the certified class, and there are no new facts that should affect their appointment. Logan Decl. ¶ 5. Tony Dickey and Paul Parmer should therefore remain class representatives, and Edelson PC should continue serving as class counsel. *See Ralston*, 2013 WL 12175069 at *1 (finding that when previously certified, the class representative and class counsel should remain in their roles for class settlement). Consequently, there is no need for the Court to revisit class certification here.

## V.      THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL

Rule 23(e) dictates that "the claims, issues, or defenses of a certified class" may only be settled with the Court's approval. *Noroma v. Home Point Financial Corporation*, No. 17-cv-07205, 2019 WL 1589980, at *7 (N.D. Cal. Apr. 12, 2019). To that end, "the Ninth Circuit maintains a strong judicial policy that favors the settlement of class actions." *Guttmann v. Ole Mexican Foods, Inc.*, No. 14-cv-0485-HSG, 2015 WL 13226627, at *4 (N.D. Cal. Nov. 13, 2015). A district court will approve a class action settlement if it is "fundamentally fair, adequate, and reasonable." *In re Lenovo Adware Litigation*, No. 15-md-02624, 2018 WL 6099948, at *6 (N.D. Cal. Nov. 21, 2018). Indeed, courts "need not apply" a "heightened standard" of fairness when a class is certified prior to settlement. *Mendez*, 2017 WL 113337, at *3. *See also Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (finding that "a higher standard of fairness and a more probing inquiry" is required for cases where the class has *not* been previously certified). In this District, courts routinely grant preliminary approval where: "(1) the proposed settlement appears to be the product of serious, informed non-collusive negotiations, (2) has no obvious deficiencies, (3) does not improperly grant preferential treatment to class representatives or segments of the class, and (4) falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (citation omitted). The proposed settlement in this case easily meets all required criteria for preliminary approval.

//

### A.     The proposed settlement is the product of serious, informed, non-collusive negotiations.

First, this settlement is the product of serious, informed non-collusive negotiations. If class counsel recommends the settlement after arms-length bargaining, courts grant "an initial presumption of fairness." *Lenovo*, 2018 WL 609994, at *7 (quoting *Harris v. Vector Mktg. Corp.*, No. 08-cv-5198, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011)). Settlements resulting from full-day formal mediations conducted by an experienced mediator only further weigh in "favor [of] granting preliminary settlement approval." *Noroma*, 2019 WL 1589980, at *8. *See also Satchell v. Fed. Exp. Corp.*, No. C 03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."). And courts also find that conducting "significant discovery" supports preliminary approval. *Lenovo*, 2018 WL 609994, at *7 *See also Austin v. Foodliner, Inc.*, No. 16-cv-07185-HSG, 2018 WL 3956208, at *7 (N.D. Cal. Aug. 17, 2018); *Esomonu v. Omnicare, Inc.*, No. 15-cv-02003-HSG, 2018 WL 3995854, at *5 (N.D. Cal. Aug. 21, 2018) (finding that conducting significant formal discovery and arms-length negotiations weigh in favor of preliminary approval).

Each of these factors is present here. The Parties engaged in extensive discovery, including the production of thousands of documents, the exchange of multiple sets of interrogatories, the depositions of both Plaintiffs, and the disclosure of expert reports. Logan Decl. ¶ 3. They also fully briefed three (3) motions to dismiss and a motion for class certification. Through this hard-fought litigation, the Parties were able to appropriately value the Class's claims and assess what would constitute a fair settlement. *See Harris*, 2011 WL 1627973, at *8. The Parties then engaged the Honorable James F. Holderman, an experienced mediator and the former Chief Judge of the Northern District of Illinois, to aid the Parties' settlement talks. During the full-day mediation, Judge Holderman presided over several rounds of arms-length settlement negotiations, and only at the end of the day, with Judge Holderman's assistance, were the Parties able to reach a settlement in principle. Logan Decl. ¶ 7. That agreement was in all material respects identical to the settlement now before the Court. Accordingly, the Court should have full confidence that the Settlement Agreement was created in good faith and without collusion.

**B.      The proposed settlement does not improperly grant preferential treatment to class representatives or segments of the class.**

Second, no segment of the Class, including Class Representatives, will receive preferential treatment under this settlement. Any class member who submits an approved claim by the claims deadline is entitled to a *pro rata* portion of the Settlement Fund, on a per-chip-purchased basis. Agreement § 2.1(b). Plaintiffs may seek incentive awards as compensation for the risk and expense they incurred as class representatives, but such awards are "fairly typical" in class action settlements. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). The Ninth Circuit generally finds that "incentive awards to named plaintiffs in a class action are permissible and do not render a settlement unfair or unreasonable." *Guttmann*, 2015 WL 13226627, at *5. Moreover, Plaintiffs have each unilaterally agreed to seek no more than $7,500 as their incentive award, an within the range generally deemed appropriate by this District. *See Covillo v. Specialtys Cafe*, No. 11-cv-00594 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014).

In this case, all class members are treated equally.

**C.      The proposed settlement falls within the range of possible approval.**

Third, this settlement falls well within the range of possible approval. To evaluate the adequacy of a proposed settlement, "courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Tableware*, 484 F. Supp. 2d at 1080. In doing so, the Court must consider the risk, anticipated expense, and complexity of further litigation when deciding whether a settlement should be preliminarily approved. *Id. See also Noroma*, 2019 WL 1589980, at *9.

Here, Plaintiffs' claims are undoubtedly strong. However, the case's inherent risks shed light on why the proposed settlement agreement is an excellent result for the Class. To begin, there are still many scenarios in which one adverse development could leave the entire class without any relief: (1) Plaintiffs could lose at summary judgment; (2) the trier of fact could return an unfavorable verdict at trial; (3) post-trial proceedings, including appeals, could reverse any of the Court's prior findings; and (4) all the while, the Court could exercise its discretion to decertify the Class. *See, e.g., Mendez*, 2017 WL 1133371, at *6. Furthermore, taking this case to trial would

require the Class to invest substantial resources (including, potentially, millions of dollars) into expert witnesses, likely including expensive experts on consumer surveys, CPU microarchitecture, and damages. *See In re TD Ameritrade Account Holder Litig.*, 2011 WL 4079226, at *5 (N.D. Cal. Sept. 13, 2011) (finding that the expenses associated with the inevitable "use of experts by both sides" weighs in favor of preliminary approval). Further litigation could, thus, actually diminish the Class's overall relief.

Given these risks and expenses, the proposed settlement agreement is an excellent result for the Class. Given the number of at-issue CPUs that were sold at retail and the claims and theory of recovery underlying the Court's class certification order, Plaintiffs' best-case scenario at trial would have been an approximately $60 million verdict. Logan Decl. ¶¶ 8-10. Thus, the value of the proposed common fund, $12.1 million, represents more than 20% of what Plaintiffs hoped to obtain at trial. That is well within the acceptable range for preliminary approval. *See Barnard v. CorePower Yoga LLC*, No. 16-cv-03861, 2017 WL 3977384, at *6 (N.D. Cal. Sept. 11, 2017) (Gilliam, J.) (estimated "16% of the maximum potential recovery" within range of approval); *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (recovery of one-sixth of the potential recovery fair given the circumstances). Moreover, even if 20% of the Settlement Class files a claim (a relatively high figure for consumer class action settlements),[4] participants are still likely to receive more than $35 per purchased chip. Logan Decl. ¶¶ 8-10. In other words, it is exceedingly likely that participating class members will receive significantly more than 50% of the value of their certified claims had they prevailed at trial. Particularly given the risks and expenses that further litigation would pose in this case, this is an excellent result for the Class.

---

[4]    In compliance with this District's Procedural Guidance for Class Action Settlements, and subject to the reality that claims rates in consumer class actions are difficult to predict based on a variety of factors, Class Counsel estimate—based largely on their experience and years of consultation with professional administrators, including the one selected for this case— that between 50,000 and 150,000 class members are likely to submit claims in this case. This estimate is also consistent with the number of claims submitted in the *In Re: Lenovo Adware Litigation*, 15-md-02624, which this Court presided over. The population of the certified class in that case bears many similarities to the settlement class here, and approximately 130,000 claim forms were submitted in that case. But, because the claims alleged in this case date back to 2011, Class Counsel anticipate that proportionally fewer claims could be made here.

**D.      The proposed settlement has no obvious deficiencies.**

Finally, this settlement has no obvious deficiencies. Obvious deficiencies include "indications of a collusive negotiation, unduly preferential treatment of class representatives, . . . or excessive compensation of attorneys." *Ebarle v. Livelock Inc.*, No. 15-cv-00258-HSG, 2016 WL 234364, at *5 (N.D. Cal. Jan. 20, 2016). "Clear sailing" arrangements and reversionary funds may suggest the presence of collusion or bad faith. *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 947 (9th Cir. 2011).

This proposed settlement does not include any indication of collusive negotiations. Attorneys' fees and incentive awards were not pre-arranged through a "clear sailing" agreement and no portion of the settlement fund will revert to Defendant. Agreement §§1.3, 8.1, 8.3. As stated above, this settlement was achieved through full-day formal negotiations conducted by an experienced mediator and was only agreed to after conducting extensive discovery. Logan Decl. ¶ 7. *See Harris*, 2011 WL 1627973, at *8. Additionally, the settlement class definition is practically identical to the class certified in this Court's class certification Order. *See Fraser v. Asus Computer Intern*, No. C 12-00652 WHA, 2012 WL 6680142, at *3 (N.D. Cal. Dec. 21, 2012) (declining to preliminarily approve a proposed settlement because release was too expansive). With "no evidence in the record suggesting that the parties engaged in collusion," this proposed settlement should be given the presumption of preliminary approval afforded to class action settlements that are reached at arms-length. *Guttmann*, 2015 WL 13226627, at *3.

For these reasons, Plaintiffs and Class Counsel firmly believe that the Settlement is fair, reasonable, and adequate, and as such, should be preliminarily approved.[5]

**VI.      THE NOTICE PLAN SHOULD BE APPROVED IN FORM AND SUBSTANCE**

---

[5]      In compliance with this District's Procedural Guidance on Class Action Settlements, Class Counsel report that they received final approval of a comparable settlement in *Garcia v. Nationstar Mortgage*, No. 15-cv-1808 (W.D. Wash.). In that case, the total settlement fund was $3,875,000, the total number of class members was 163,485, the total number of class members to whom direct notice was sent via U.S. Mail was 49,477 (in addition to other notice methods including email and a settlement website), the number of claims and claims rate were 15039 and 9.2% (respectively), the average recovery per claimant was approximately $190, no *cy pres* funds were distributed, the notice and administration costs were $120,000, attorneys' fees awarded were $968,750, and costs awarded were $16,383.53.

In Rule 23(b)(3) class actions, the Court is required to direct notice to all class members. *Lenovo*, 2018 WL 6099948, at *8. This notice must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Id*. (citing Fed. R. Civ. P. 23(c)(2)(B)). Settlement administrators may distribute notice to the class via "United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B). Importantly, notice "must clearly and concisely state in plain, easily understood language: (i) the nature of the action, (ii) the definition of the class certified, (iii) the class claims, issues, or defenses, (iv) that a class member may enter an appearance through an attorney if the member so desires, (v) that the court will exclude from the class any member who requests exclusion, (vi) the time and manner for requesting exclusion, and (vii) the binding effect of a class judgment on members. *Black v. T-Mobile USA, Inc.*, No. 17-cv-04151-HSG, 2019 WL 499748, at *6-7 (N.D. Cal. Feb. 8, 2019) (citing Fed. R. Civ. P. 23(c)(2)(B)). It should make sure to "apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *De La Torre v. CashCall, Inc.*, No. 08-cv-03174-MEJ, 2017 WL 2670699, at *10 (N.D. Cal. June 21, 2017) (citation omitted). Proper notice also describes the aggregate amount of the settlement fund and the plan for allocation. *Rodriguez*, 563 F.3d at 962.

Here, the proposed notice plan fully meets the requirements for 23(b)(3) class actions.[6] Based on physical addresses and emails provided by third-party vendors pursuant to subpoenas issued by Class Counsel, the Settlement Administrator[7] will send direct notice to hundreds of

---

[6]    CAFA notice is required in this case. Class Counsel is informed that CAFA notice was provided by Defendants on August 29, 2019.

[7]    In compliance with this District's Procedural Guidance on Class Action Settlements, Class Counsel reports that they solicited proposals from four third-party administrators before selecting Angeion Group. Angeion was selected for a variety of reasons, including that it has demonstrated subject matter expertise administering settlements in cases similar to this one, including the *In Re Lenovo Adware Litigation*. Angeion proposes notice by U.S. mail, email, and social media, among other methods, and proposes payments via check and Paypal. Class Counsel has engaged Angeion Group once before, in 2016, in *Thornton, et al. v. NCO Financial Systems, Inc.* No. 16-CH-5780 (Cook. Cty. Ill.). While the anticipated costs of the notice program may vary widely depending on certain unknown factors, including the number of additional addresses provided by subpoenaed vendors as well as the potential need for a second round of postcard

---

thousands of class members via both U.S. Mail and email. Agreement §§ 4.1(b)-(c); *see also* Exhibit 3, Declaration of Steve Weisbrot ("Weisbrot Decl.") ¶ 14-22. These notices use plain, simple language to describe the lawsuit, the basic parameters of the settlement (*i.e.*, the settlement's key terms; how a person can determine eligibility; other options available to Class Members), the identity of Class Counsel, the process to make a claim, and where to get more information. *Id.* ¶¶ 40-41. Notice via email will include an electronic link to the Claim Form and notification through U.S. Mail will contain a postcard with return prepaid postage. *Id.* ¶¶ 16, 20; *see also* Settlement Agreement, Exhibits B, C. In addition to direct notice, notification will also be provided via a settlement website, Internet banner ads on websites likely to be visited by Settlement Class Members, and to the appropriate state and federal officials as required by the Class Action Fairness Act, 28 U.S.C. § 1715. Weisbrot Decl. ¶¶ 13, 30-33; *see also* Settlement Agreement §§ 4.1(d)-(f) and Exhibits D, E. The settlement website will include the ability to file claim forms online and will be periodically updated to provide the estimated *pro rata* payment amount based on the number of participating settlement class members. Weisbrot Decl. ¶ 35; *see also* Settlement Agreement § 4.1(d). All forms of notice will advise the Settlement Class of their rights, including the right to be excluded from, comment upon, and/or object to the Settlement Agreement or any of its terms. Weisbrot Decl. ¶ 9; *see also* Settlement Agreement § 4.2.

For these reasons, the proposed methods for providing notice to the Settlement Class fully comport with Rule 23, and thus, should be approved.

## VII.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests that the Court: (i) grant preliminary approval of the proposed Settlement Agreement; (ii) schedule the final approval hearing; and (iii) grant such further relief the Court deems reasonable and just.

\*            \*            \*

notice and/or a potential second distribution, Class Counsel estimate that the costs of notice—which will be paid by the common fund—are likely to range between $350,000 and $700,000. Those costs range between approximately 35 cents and 70 cents per certified class members, which Class Counsel believes to be reasonable.

Respectfully submitted,

**TONY DICKEY and PAUL PARMER**,
individually and on behalf of all others similarly
situated,

Dated:  August 23, 2019

By: /s/ Todd Logan
One of Plaintiffs' Attorneys

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Todd Logan (SBN 305912)
tlogan@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs and the Class*